UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF TEXAS

FORT WORTH DIVISION

| | | |
|---|---|---|
| JAMES R. HARRISON, et al., Individually and on Behalf of All Others Similarly Situated, | § § § | Civil Action No. 4:09-cv-00768-Y (Consolidated with 4:10-cv-00007-Y and 4:10-cv00094-Y) |
| Plaintiffs, | § § | |
| vs. | § § | |
| XTO ENERGY, INC., et al., | § § | |
| Defendants. | § § § | |
| | § | |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO THE INDIVIDUAL DEFENDANTS'
MOTION TO DISMISS THE PAPPAS PLAINTIFFS' SHAREHOLDER
COMPLAINT FOR VIOLATIONS OF §14(a) AND §20(a)
OF THE SECURITIES EXCHANGE ACT OF 1934**

# TABLE OF CONTENTS

Page

I.    INTRODUCTION .................................................................................................1

II.   BACKGROUND ...................................................................................................3

III.  ARGUMENT .......................................................................................................9

      A.    The Proxy Misrepresented and Omitted Material Information.............................9

            1.    The Standard for Materiality......................................................................9

            2.    The Data and Inputs Underlying Barclays' Fairness Opinion ..................10

            3.    Jefferies' Financial Analysis...................................................................12

            4.    The Treatment of the Company's Hedging Positions................................13

            5.    Due Diligence on Exxon ........................................................................13

      B.    The Pleading Standard for Claims Under §14(a) and Rule 14a-9 Has Been
            Met or Exceeded .........................................................................................14

      C.    Plaintiffs State a Claim for Control Person Liability............................................17

IV.   CONCLUSION...................................................................................................19

# TABLE OF AUTHORITIES

**Page**

## CASES

*Abbott v. Equity Group*,
2 F.3d 613 (5th Cir. 1993) ...................................................................2, 3

*Alidina v. Internet.com Corp.*,
No. 17235-NC, 2002 Del. Ch. LEXIS 156
(Del. Ch. Nov. 6, 2002)........................................................................11

*Am. Gen. Ins. Co. v. Equitable Gen. Corp.*,
493 F. Supp. 721 (E.D. Va. 1980) ......................................................17

*Arthur Children's Trust v. Keim*,
994 F.2d 1390 (9th Cir. 1993) .............................................................17

*Beck v. Dombrowski*,
559 F.3d 680 (7th Cir. 2009) ...............................................................15

*Cent. Laborers' Pension Fund v. Integrated Elec. Servs.*,
497 F.3d 546 (5th Cir. 2007) ...............................................................16

*City of Clinton v. Pilgrim's Pride Corp.*,
No. 4:09-CV-386-Y, 2009 U.S. Dist. LEXIS 117525
(N. D. Tex. Nov. 23, 2009) .............................................................15, 16

*Dennis v. Gen. Imaging, Inc.*,
918 F.2d 496 (5th Cir. 1990) .................................................................2

*G.A. Thompson & Co. v. Partridge*,
636 F.2d 945 (5th Cir. 1981) ...............................................................17

*Globis Partners, L.P. v. Plumtree Software, Inc.*,
No. 1577-VCP, 2007 Del. Ch. LEXIS 169
(Del. Ch. Nov. 30, 2007)......................................................................12

*Goldman v. Belden*,
754 F.2d 1059 (2d Cir. 1985)...............................................................10

*Heller v. Am. Indus. Props. Reit*,
No. SA-97-CA-1315-EP, 1998 U.S. Dist. LEXIS 23286
(W.D. Tex. Sept. 28, 1998)..................................................................10

*Hill York Corp. v. Am. Int'l Franchises, Inc.*,
448 F.2d 680 (5th Cir. 1971) ...............................................................17

**Page**

*In re Browning-Ferris Indus. S'holder Deriv. Litig.*,
    830 F. Supp. 361 (S.D. Tex. 1993) ...................................................................14

*In re Dynegy, Inc.*,
    339 F. Supp. 2d 804 (S.D. Tex. 2004) .............................................................17

*In re Netsmart Techs., Inc. S'holders Litig.*,
    924 A.2d 171 (Del. Ch. 2007)...................................................................10, 11

*In re Pure Resources, Inc., S'holders Litig.*,
    808 A.2d 421 (Del. Ch. 2002).............................................................10, 11, 12

*In re Real Estate Assocs. Ltd. P'ship Litig.*,
    223 F. Supp. 2d 1142 (C.D. Cal. 2002) ...........................................................10

*In re Storage Tech. Corp. Sec. Litig.*,
    630 F. Supp. 1072 (D. Colo. 1986)..................................................................17

*In re Thornburg Mortgage Sec. Litig.*,
    No. CIV 07-0815 JB/WDS, 2010 U.S. Dist. LEXIS 13375
    (D.N.M. Jan. 27, 2010) ...................................................................................18

*Justin Indus., Inc. v. Choctaw Sec., L.P.*,
    920 F.2d 262 (5th Cir. 1990) .......................................................................9, 10

*Keys v. Wolfe*,
    540 F. Supp. 1054 (N.D. Tex. 1982),
    *rev'd on other grounds*, 709 F.2d 413 (5th Cir. 1983) ....................................18

*Lockspeiser v. Western Maryland Co.*,
    768 F.2d 558 (4th Cir. 1985) ...........................................................................10

*Pedroli v. Bartek*,
    564 F. Supp. 2d 683 (E.D. Tex. 2008)..............................................................18

*Radol v. Thomas*,
    556 F. Supp. 586 (S.D. Ohio 1983),
    *aff'd*, 772 F.2d 244 (6th Cir. 1985)..................................................................10

*Rich v. Maidstone Fin., Inc.*,
    No. 98 Civ 2569 (DAB), 2001 U.S. Dist. LEXIS 3167
    (S.D.N.Y. Mar. 23, 2001) ...............................................................................17

*Salit v. Stanley Works*,
    802 F. Supp. 728 (D. Conn. 1992)...................................................................17

**Page**

*SEC v. Kornman*,
    391 F. Supp. 2d 477 (N.D. Tex. 2005) ...........................................................................10

*SEC v. Savoy Indus., Inc.*,
    587 F.2d 1149 (D.C. Cir. 1978) ......................................................................................18

*Southland Secs. Corp. v. INSpire Ins. Solutions Inc.*,
    365 F.3d 353 (5th Cir. 2004) ......................................................................................9, 17

*Stahl v. Gibraltar Fin. Corp.*,
    967 F.2d 335 (9th Cir. 1992) ...........................................................................................1

*Texas Partners v. Conrock Co.*,
    685 F.2d 1116 (9th Cir. 1982) .......................................................................................10

*Trendsetter Investors, LLC v. Hyperdynamics Corp.*,
    No. H-06-0746, 2007 U.S. Dist. LEXIS 3666
    (S.D. Tex. Jan. 18, 2007) ...............................................................................15, 17, 18

*TSC Indus. v. Northway, Inc.*,
    426 U.S. 438 (1976)....................................................................................................9, 10

*United States v. Peterson*,
    101 F.3d 375 (5th Cir. 1996) .........................................................................................10

*Washtenaw County Employees Ret. Sys. v. Wells Real Estate Inv. Trust, Inc.*,
    No. 1:07-CV-862-CAP, 2008 U.S. Dist. LEXIS 53652
    (N.D. Ga. Mar. 31, 2008) ..............................................................................................15

*Wilson v. Great Am. Indus.*,
    855 F.2d 987 (2d Cir. 1988)...........................................................................................14

*Zagami v. Natural Health Trends Corp.*,
    540 F. Supp. 2d 705 (N.D. Tex. 2008) .......................................................................9, 10

**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
    §78n(a) ....................................................................................................... *passim*
    §78t(a) ........................................................................................................ *passim*

17 C.F.R.
    §240.14d-9 ..............................................................................................................14

**Page**

Federal Rule of Civil Procedure
  Rule 8(a).................................................................................................................18
  Rule 9(b).............................................................................................................2, 15

## SECONDARY AUTHORITIES

T. Hazen, *The Law of Securities Regulation* (5th ed. 2005)
  §11.4........................................................................................................................9

## I.     INTRODUCTION

Defendants' Motion fails, in the first instance, for the simple and straightforward reason that they have already publicly conceded, in the Amended Proxy filed on March 24, 2010, the materiality of many of plaintiffs' allegations of omissions and misrepresentations.[1]  In the Amended Proxy, defendants disclosed, or partially disclosed, much, but not all, of the material information plaintiffs' Complaint alleges was omitted and/or misrepresented in the Proxy,[2] including material information concerning: (i) the interactions between defendants Bob R. Simpson ("Simpson"), Jack P. Randall ("Randall") and Exxon Mobil Corp. ("Exxon"); (ii) the strategic alternatives available to XTO Energy Inc. ("XTO" or the "Company"); (iii) the financial projections underlying the financial analyses of Barclays Capital, Inc. ("Barclays"); (iv) the synergies expected to be realized if the proposed merger of XTO and Exxon (the "Merger") is consummated; (v) Barclays' Net Asset Value ("NAV") analysis; (vi) Barclays' Comparable Companies Analysis; and (vii) Barclays' Comparable Transactions Analysis.  And by conceding the materiality of the allegations in the Complaint, defendants have essentially admitted that the Complaint, to the extent it relies upon these misstatements and/or omissions, is legally sufficient and cannot be dismissed.  *See Stahl v. Gibraltar Fin. Corp.*, 967 F.2d 335, 337 (9th Cir. 1992) (noting that materiality is the "touchstone of a section 14(a) violation").[3]

---

[1]     "Amended Proxy" refers to the Amendment No. 1 to Form S-4 Registration Statement, filed with the Securities and Exchange Commission ("SEC") on March 24, 2010.  The Amended Proxy is attached as Exhibit A to the Appendix in Support of Plaintiffs' Response in Opposition to the Individual Defendants' Motion to Dismiss the Pappas Plaintiffs' Shareholder Complaint for Violations of §14(a) and §20(a) of the Securities Exchange Act of 1934 ("Appendix").

[2]     "Proxy" refers to the Preliminary Registration Statement on Form S-4, filed with the SEC on February 1, 2010.

[3]     Admittedly, defendants may argue at some point that these allegations have been mooted by their recent Proxy amendment, but that is not the basis of their current Motion, and therefore, not

Moreover, plaintiffs have alleged that defendants have not disclosed certain other material information in the Proxy, including: (i) material data and inputs underlining Barclays' NAV Analysis and Transactions Analysis; (ii) specific information regarding any analysis performed by Jefferies & Co., Inc. ("Jefferies"); (iii) the impact from the Company's hedging activities on the fairness of the consideration offered by Exxon (and/or any analysis related thereto), and defendants have not challenged these allegations on materiality grounds (or any other grounds for that matter); and (iv) due diligence conducted on Exxon by XTO. Not only have defendants *not* challenged many of these allegations on materiality grounds, or any other grounds for that matter, but defendants did *not* supplement their proxy materials to provide this information. And, those allegations that were, however briefly, addressed by defendants (*i.e.*, the Jefferies analyses) are so clearly material under accepted case law that defendants' challenge must fail. Thus, these unaddressed allegations of misstatements/omissions also survive and support denial of defendants' Motion.

Other than challenging materiality, defendants' Motion makes some generalized arguments about pleading standards under the Private Securities Litigation Reform Act of 1995 ("PSLRA") and Federal Rule of Civil Procedure 9(b), and how these somehow apply to §14(a). These arguments, however, are wrong under accepted case law; and plaintiffs nonetheless meet the higher standard sought to be imposed.

Defendants' remaining arguments challenge their liability under §20(a). These arguments fail because, like with materiality, defendants have actually conceded that they all "'had actual power or influence over'" drafting and dissemination of the Proxy. *See Abbott v. Equity Group*, 2 F.3d 613, 620 (5th Cir. 1993) (quoting *Dennis v. Gen. Imaging, Inc.*, 918 F.2d 496, 509 (5th Cir.

---

grounds for dismissal. All citations and footnotes are omitted, and emphasis is added unless otherwise stated.

1990)).  This is all that is necessary for liability under §20(a) to attach.  *Id.*  Accordingly, defendants'

Motion must be denied.

## II.     BACKGROUND

XTO engages in the acquisition, exploration, and production of oil and natural gas.  ¶22.[4]

XTO's resource base exceeds 45 trillion cubic feet of natural gas, and the Company owns interests in

18,235.7 producing wells, which accounts for about 70% of XTO's revenues.  ¶¶22-23.  On its

website, XTO proclaims its "low-risk inventory should provide steady production and [natural gas]

reserve growth for years to come.  Given its low cost structure and strong producing margins, XTO

is consistently a leader in realizing top economic returns for its shareholders."  ¶23.

Despite reduced natural gas prices during the past year, XTO remains a robust and growing

company.  ¶24.  XTO revenues for 2007 surged 20.5% over the prior year; revenues for 2008 soared

39.6% over the year before; and as of September 30, 2009 revenues had jumped 18.5%.  *Id.*  XTO's

substantial growth in turn has led to significant and prolonged increases in stock price.  *See id.*

According to Jonathan Wolfe, a Credit Suisse managing director, XTO's "stock price has grown at a

compound rate of 24.2% a year since 1993."  *Id.*  On November 9, 2009, an Oppenheimer & Co.

analyst rated XTO an "outperform" and forecasted a $53 per share price target, though "[n]atural gas

prices were down 66% and 5% from prior periods, which negatively impacted unhedged production

volumes and more than offset the benefits to earnings from increased production from prior periods."

¶27.

By acquiring XTO, Exxon obtains a major position in unconventional gas assets and natural

gas extraction methods, diversifies its natural gas production, and improves its extraction

---

[4]     All "¶__" references are to Plaintiffs' Shareholder Complaint for Violations of §14(a) and
§20(a) of the Securities Exchange Act of 1934.

technologies.  ¶¶25-26.  The Merger enhances Exxon's long-term strategic goal of enhancing its ability to develop unconventional natural gas reserves.  ¶25.  A December 16, 2009 *Reuters* article observed, "global demand for natural gas is expected to surge back more than 50 percent by 2030, making it the fastest-growing major energy source of the next few decades and promising fat profits for reserve holders."  *Id.*  The article continued, "Exxon said last week it sees gas demand rising by an average of 1.8 percent per year over the next two decades compared with 0.8 percent for oil, largely because power generation is set to grow faster than any other energy type to 40 percent of total primary energy demand."  *Id.*  The XTO "takeover gives ExxonMobil a major position in so-called unconventional gas assets in North America, which include shale plays, where gas trapped in underground rock formations requires expensive and complex drilling techniques."  *Id.*

In the summer of 2009, XTO's chairman and founder, Simpson, authorized Randall, an XTO director and senior member of XTO's financial advisor Jefferies, to approach Exxon about the potential for a strategic transaction.  ¶28.  Between August and September 2009, several conversations took place between Simpson, Randall, and Exxon CEO Rex Tillerson.  ¶29.  Among other things, "preserving the expertise of XTO Energy's organization" and alternative forms of consideration for the sale of XTO were discussed.  *Id.*  Tillerson indicated a "key factor" for any transaction would be retaining XTO's senior officers.  *Id.*

Although XTO directors Simpson and Randall had already initiated talks with Exxon, Simpson neglected to inform the XTO Board of a potential transaction with Exxon until September 30, 2009.  ¶30.  XTO's Board authorized continued discussions with Exxon despite Simpson's clear bias in favor of a transaction with Exxon and Exxon's desire to retain Simpson and other XTO senior management in the combined company.  *Id.*

During October 2009, Simpson and Tillerson continued to discuss terms of a potential transaction.  ¶¶31-32.  They eventually agreed to proceed with an all-stock purchase of XTO and

entered into a confidentiality and mutual standstill agreement.  ¶¶32-33.  On October 21, XTO's Board convened a special meeting to discuss a potential transaction with Exxon, including the potential exchange ratio, retention of senior XTO executives in the new company, and potential strategic alternatives.  ¶34.  The XTO Board then authorized senior management to review the draft merger agreement Exxon already had prepared and tasked investment bank Barclays with preparing a financial analysis of the Merger.  *Id.*  Subsequently, XTO's Board formally engaged Barclays and Jefferies as financial advisors concerning the Merger, although director Randall was a senior member of Jefferies and was participating in the Merger negotiations.  ¶36.  The Board also agreed to pay $24 million each to Barclays and Jefferies, contingent on consummation of the Merger.  ¶¶36, 46.

During the ensuing weeks, XTO and Exxon continued to negotiate exclusively with each other on the Merger terms.  ¶37.  The XTO Board deferred negotiations to Simpson and allowed him to continue speaking with Exxon despite his self-interest in retaining a position in the post-Merger Company.  *Id.*  On December 13, 2009, final Merger terms were reached, including a $900 million termination fee for Exxon and an exchange ratio of 0.7098 Exxon shares for each XTO share.  ¶39. Simpson agreed to this ratio without obtaining for XTO shareholders a floor on Exxon's stock pricing, which would allow XTO to terminate the Merger without penalty if Exxon stock dipped below the floor.  *Id.*  Two days later, Barclays presented its "fairness" opinion to the XTO Board. ¶40.  There is no mention whether Jefferies provided any financial analysis at the meeting.  *Id.* Every single XTO board member but Randall, who abstained, approved the Merger.  *Id.*

In an attempt to secure shareholder support for the Merger, on February 1, 2010, the Individual Defendants and Exxon issued the Proxy.  ¶41.  The Proxy, which urges XTO shareholders to vote for the Merger, omits and misrepresents material information about the unfair sales process, the unfair consideration offered in the Merger, and the intrinsic value of XTO, both as a stand alone

entity and as a merger partner for Exxon. *Id.* As detailed in the Complaint, the Proxy misrepresented and/or omitted the following material facts:

- ***The basis for the XTO Chairman's decision to permit XTO management to approach Exxon regarding a potential merger****.* The Proxy fails to explain to shareholders why XTO was seeking a combination transaction with Exxon, particularly at a time when the price of natural gas was rising and the price of oil was declining. ¶¶28, 43. The Proxy also fails to disclose whether Simpson informed the Board before approaching Exxon and whether the Board authorized him to take such action in advance of making the contact. ¶43.

- ***The strategic alternatives available to XTO****.* The Proxy states the XTO Board considered a "range of alternatives" to the merger with Exxon without disclosing what those alternatives actually were or how they compared financially to the Merger. ¶¶44-45.

- ***The financial analysis performed by Jefferies****.* The Proxy fails to include any of the financial analysis Jefferies conducted in connection with its valuation of the Merger. ¶46. The Proxy merely notes the Board discussed with its financial advisors the value that might be obtained by XTO Energy stockholders in the Merger. *Id.*

- ***The outcome of XTO's bankers' due diligence and financial evaluation of Exxon as a proposed merger partner****.* The Proxy fails to disclose what, if any, analysis Jefferies or Barclays conducted with respect to the values of Exxon's share or the projected value of the combined companies. ¶47.

- ***The financial projections relied on by Barclays in its Discounted Cash Flow ("DCF") Analysis****.* Without disclosure of these financial projections, shareholders cannot reconcile the DCF analysis conducted by Barclays with public market information. ¶50. Shareholders must be provided a reliable estimate of XTO's future cash flows in order to understand the Company's intrinsic value. ¶53.

- ***The Board's financial advisors' treatment of XTO's hedging contracts in their financial analysis****.* The Proxy fails to disclose how XTO's hedging contracts were treated in the financial advisors' valuation analysis. ¶¶54-56. The omission of this information prevents shareholders from assessing the adequacy of the merger consideration. *Id.*

- ***The estimates of synergies that will flow to Exxon as a result of the Merger****.* The Proxy fails to disclose any valuation of potential synergies, which prevents shareholders from knowing if they are being adequately compensated with an appropriate share exchange ratio for the synergies that XTO assets contribute to the Merger. ¶¶57-59. Rather, the Proxy conclusively states Exxon's belief that "the merger will create significant synergies" as a result of the Merger. *Id.* Because XTO's unconventional natural gas assets will contribute significant synergies to the Merger, shareholders should be compensated for the value of these synergies. ¶60.

- 6 -

- ***The inputs and data underlying Barclays' NAV Analysis***. The Proxy fails to disclose: (i) the specific adjustments made "to reflect location and quality differentials"; (ii) the discount rates used; and (iii) any information regarding the reserve, production and capital cost estimates used in the analysis. The NAV assesses the intrinsic value of XTO's hard assets, and, without such information shareholders cannot independently assess whether Barclays has adequately measured these assets' value. ¶61.

- ***The inputs and data underlying Barclays' Comparable Companies Analysis***. The Proxy fails to disclose: (i) a clear definition of discretionary cash flow, as used in this analysis; and (ii) how the value of XTO's hedge positions contributed to Barclays' value conclusions (if at all). The Comparable Companies Analysis assesses the public market value of XTO as compared to its comparables, and, without this information, shareholders cannot assess whether Barclays' analysis, as set forth in the Proxy, is an adequate measure of this value assessment. ¶63.

- ***The inputs and data underlying Barclays' Comparable Transactions Analysis***. The Proxy fails to disclose: (i) how the value of the "non-exploration and production assets" was determined; (ii) the specific adjustment made to XTO's enterprise value for the value of nonexploration and production assets; (iii) how the value of XTO's hedge positions contributed to Barclays' value conclusions (if at all). The Comparable Transactions Analysis assesses the consideration offered in the Merger as compared to comparable transactions, and, without this information, shareholders cannot assess whether Barclays' analysis, as set forth in the Proxy, is an adequate measure of this value assessment. ¶63.

On March 24, 2010, defendants issued the Amended Proxy. The Amended Proxy disclosed much of the material information outlined above, including material information concerning: (i) the interactions between defendants Simpson, Randall and Exxon; (ii) the strategic alternatives available to the Company[5]; (iii) the financial projections underlying the financial analyses of Barclays; (iv) the synergies expected to be realized if the Merger is consummated[6]; (v) Barclays' NAV analysis[7];

---

[5]    In the Amended Proxy defendants disclosed material information concerning: (i) the reasons why XTO's Chairman allowed XTO management to pursue Exxon about a potential merger (*compare* ¶¶42-43 *with* Appendix, Ex. A at 52, 54); (2) why XTO preferred the merger with Exxon over other business options for XTO (*compare* ¶43 *with* Appendix, Ex. A at 54-58); and (3) the other strategic alternatives that XTO management considered (*compare* ¶44 *with* Appendix, Ex. A at 54-58).

[6]    The Proxy provided a brief discussion of the anticipated "development synergies" and briefly summarized Barclays' Pro Forma Merger Consequences Analysis. ¶¶57-58. The Proxy did not

- 7 -

(vi) Barclays' Comparable Companies Analysis[8]; and (vii) Barclays' Comparable Transactions Analysis.[9]   Thus, defendants have already admitted the materiality of a number of plaintiffs' allegations of material omissions and misrepresentations, thus making analysis of defendants' Motion largely irrelevant.

The Proxy or any amendment thereto, however, did not disclose certain other material information, including: (i) material data and inputs underlining Barclays' NAV Analysis and Transactions Analysis; (ii) specific information regarding any analysis performed by Jefferies; (iii) the impact from the Company's hedging activities on the fairness of the consideration offered by Exxon (and/or any analysis related thereto), and defendants have not challenged these allegations on materiality grounds (or any other grounds for that matter); and (iv) due diligence conducted on Exxon by XTO.   As discussed below, plaintiffs' allegations regarding these omissions and misrepresentations are well pled and dictate denial of defendants' Motion.

---

disclose any valuation or quantification of these synergies, however.  In the Amended Proxy, defendants described the source of the expected synergies in more detail, as well as the expected time frame for realization of these synergies, but conceded that the synergies "cannot be quantified with certainty at present."  Appendix, Ex. A at 68.

[7]      With respect to Barclays' NAV analysis, defendants disclosed: (i) specific adjustments made to "reflect location and quality differentials" of the assets (*compare* ¶61 *with* Appendix, Ex. A at 72); and (ii) the discount rate used (*compare* ¶61 *with* Appendix, Ex. A at 72).

[8]      With respect to Barclays' Comparable Companies Analysis, defendants disclosed the definition of discretionary cash flow (*compare* ¶62 *with* Appendix, Ex. A at 73-74).

[9]      With respect to Barclays' Comparable Transactions Analysis, defendants disclosed how the value of the "non-exploration and production assets" was determined (compare ¶63 with Appendix, Ex. A at 74-75).

## III.    ARGUMENT

### A.    The Proxy Misrepresented and Omitted Material Information

Defendants do not contend that the material information plaintiffs allege was misrepresented and/or omitted from the Proxy (at least originally) was in fact fairly disclosed.  Instead, defendants contend that plaintiffs' alleged omissions and/or misrepresentations are somehow immaterial.  Incorrect.  As discussed below, defendants' position is unsupported under the case law.  Perhaps more importantly, given the fact-intensive and case-specific inquiry under the materiality standard, defendants' position is effectively undermined by their disclosure of related material information in the Amended Proxy.

### 1.    The Standard for Materiality

"The general standard of materiality" under §14(a) "is as follows:  An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *TSC Indus. v. Northway, Inc.*, 426 U.S. 438, 449 (1976).  "This standard . . . does not require proof of a substantial likelihood that disclosure of the omitted fact would have caused the reasonable investor to change his vote." *Id.*  Rather, it contemplates a showing "'that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder.'" *Zagami v. Natural Health Trends Corp.*, 540 F. Supp. 2d 705, 710 (N.D. Tex. 2008) (quoting *Southland Secs. Corp. v. INSpire Ins. Solutions Inc.*, 365 F.3d 353, 362 (5th Cir. 2004)).

"When considering materiality, a court must evaluate the 'total mix' of information available." *Justin Indus., Inc. v. Choctaw Sec., L.P.*, 920 F.2d 262, 267 (5th Cir. 1990).  "'The materiality of an omission in a proxy statement is determined by taking into account all information in the public domain and facts reasonably available to the public to be used by shareholders in interpreting the information in the proxy sent to them.'" *Id.*  (quoting T. Hazen, *The Law of*

- 9 -

*Securities Regulation* §11.4 at 315 (5th ed. 2005)). Under the general rule, "materiality is a question reserved to the fact-finder." *Id*. *See also Zagami*, 540 F. Supp. 2d at 711 (materiality "is an issue 'usually left for the jury,' because 'materiality is a mixed question of law and fact'") (quoting *United States v. Peterson*, 101 F.3d 375, 380 (5th Cir. 1996)). Thus, "the question of materiality cannot be resolved on a motion to dismiss unless the facts are 'so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.'" *SEC v. Kornman*, 391 F. Supp. 2d 477, 485 (N.D. Tex. 2005) (securities fraud action) (quoting *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985)). *See also TSC Indus.*, 426 U.S. at 448 ("Doubts as to the critical nature of information misstated or omitted . . . [should] be resolved in favor of those the statute is designed to protect."); *Heller v. Am. Indus. Props. Reit*, No. SA-97-CA-1315-EP, 1998 U.S. Dist. LEXIS 23286, at *19 (W.D. Tex. Sept. 28, 1998) (noting that action was "simply at too early a stage to grant dismissal on Defendants' claims that no material misrepresentations or omissions were made in this case").

### 2.    The Data and Inputs Underlying Barclays' Fairness Opinion

There is no more material information for shareholders in a merger than the information underlying or supporting the purported "fair value" of their shares. *See Lockspeiser v. Western Maryland Co.*, 768 F.2d 558, 561 (4th Cir. 1985); *Texas Partners v. Conrock Co.*, 685 F.2d 1116, 1120 (9th Cir. 1982); *In re Real Estate Assocs. Ltd. P'ship Litig.*, 223 F. Supp. 2d 1142, 1149 n.5 (C.D. Cal. 2002); *Radol v. Thomas*, 556 F. Supp. 586, 594 (S.D. Ohio 1983), *aff'd*, 772 F.2d 244 (6th Cir. 1985); *Heller*, 1998 U.S. Dist. LEXIS 23286, at *18; *In re Netsmart Techs., Inc. S'holders Litig.*, 924 A.2d 171, 203-04 (Del. Ch. 2007); *In re Pure Resources, Inc., S'holders Litig.*, 808 A.2d

421, 449 (Del. Ch. 2002).[10]   Recognizing this legal maxim, defendants disclosed much, but not all, of the information underlying Barclays' financial analysis supporting its fairness opinion that was omitted or misrepresented in the Proxy, and formed the bases for many of the allegations in the Complaint.

Defendants however, fail to disclose other material portions of Barclays' analyses, including: (i) information regarding the reserve, production and capital cost estimates in Barclays' NAV analysis; and (ii) the specific adjustments made to XTO Energy's enterprise value for the value of non-exploration and production assets in Barclays' Comparable Transactions Analysis.  Defendants have disclosed other material details of these analyses as discussed above.  Thus, they have undermined their only arguments against the materiality of these additional data and inputs for Barclays' NAV and Comparable Transactions Analysis – that the Proxy disclosed enough with respect to these analyses, and any additional disclosure would be "unnecessary" and "unhelpful," and amount to just a "quibble" with Barclays' opinion.  *See* Defs. Motion at 15-16.  Clearly defendants now concede that the analyses were incomplete, thus demonstrating the sufficiency of plaintiffs' allegations with respect to the rest of the material data and inputs underlying these analyses as well.

---

[10]     Courts have noted that simply disclosing "the banker's 'fairness opinion' alone and without more, provides stockholders with nothing other than a conclusion, qualified by a gauze of protective language designed to insulate the banker."  *Pure Resources*, 808 A.2d at 449; *see Netsmart*, 924 A.2d at 203-04.  Rather, in addition to an investment banker's bare opinion that a transaction is "fair," shareholders are "entitled to a fair summary of the substantive work performed by the investment bankers upon whose advice the recommendations of their board as to how to vote on a merger or tender rely."  *Alidina v. Internet.com Corp.*, No. 17235-NC, 2002 Del. Ch. LEXIS 156, at *37 (Del. Ch. Nov. 6, 2002).  Equipping shareholders with the necessary information to inform a decision as to the adequacy of the merger consideration requires divulging "the underlying data the investment banker relied upon," *id.*, "the basic valuation exercises that [the investment banker] undertook, the key assumptions that they used in performing them, and the range of values that were thereby generated."  *Pure Resources*, 808 A.2d at 449.

### 3.     Jefferies' Financial Analysis

The Proxy as originally filed, failed to disclose the financial analysis conducted by Jefferies in connection with its valuation of the Merger.  ¶46.  Recognizing that what was in the Proxy was insufficient, the Amended Proxy slightly rectified this omission by discussing what Jefferies did. But defendants still fail to provide any of the material details of the analysis that was conducted (not even in summary form).  As discussed in the Complaint, general references to the fact that Jefferies did some valuation work, without sufficiently discussing or disclosing that work, renders the Proxy (and now the Amended Proxy) materially misleading.

Arguing against materiality, defendants suggest *Globis Partners* supports their claim that they really did not need to disclose any portions of Jeffries' analysis.  *See* Defs. Motion at 17 (citing *Globis Partners, L.P. v. Plumtree Software, Inc*., No. 1577-VCP, 2007 Del. Ch. LEXIS 169 (Del. Ch. Nov. 30, 2007).  But *Globis Partners* actually cuts the other way.  In *Globis Partners*, the court noted that the proxy attached the fairness opinion by Jefferies and provided a seven-page discussion of the analysis.  2007 Del. Ch. LEXIS, at *7, *34-*35 n.76.  Given what was disclosed, "[s]tockholders who disagreed with Jefferies' analyses had sufficient information to make an informed decision." *Id*. at *7-*8, *42.  Here, absolutely nothing of Jefferies analyses was disclosed. Thus shareholders are not in a position to make any assessment of Jefferies' work or otherwise make an informed decision in connection with that analysis.  *See Pure Resources*, 808 A.2d at 449 ("stockholder engaging in the before-the-fact decision whether to tender would find it material to know the basic valuation exercises that [financial advisors] undertook, the key assumptions that they used in performing them, and the range of values that were thereby generated").  The Complaint therefore sufficiently pleads a §14(a) claim with respect to the omitted Jefferies' analyses.

### 4.    The Treatment of the Company's Hedging Positions

The principal facet of Barclays' analysis that defendants do not touch on in the Amended Proxy is Barclays' treatment of the Company's hedging positions.  The Complaint explains the materiality of this omission: XTO is a market leader in hedging contracts, and these hedging contracts are material to XTO's financial prospects because this income stream "protect[s] the Company against fluctuations in energy prices and thus provide a guaranteed level of income." ¶56.  The Proxy omits any discussion of how Barclays addressed these contracts in its valuation analysis. ¶¶54-56.

For their part, ***defendants do not directly (or even indirectly) argue in their Motion that the omission of any discussion regarding how Barclays treated the Company's hedging contracts was somehow not material***.  Thus, they have effectively conceded this point, as they have conceded the materiality of other alleged misrepresentations and omissions, as discussed above.

### 5.    Due Diligence on Exxon

The Proxy did not disclose the outcome of XTO's bankers' due diligence and financial evaluation of Exxon as a proposed merger partner or what, if any analysis Jefferies or Barclays conducted with respect to the value of Exxon's shares or the projected value of the combined companies.  ¶47.  As alleged in the Complaint, this information is material because this is a stock-for-stock transaction, meaning that XTO shareholders will receive only Exxon stock and no cash if the Merger is consummated.  Thus the analyses of the Board's financial advisors of the value of that stock is critical to shareholders' assessment of whether to accept Exxon stock or seek appraisal of their shares (and ultimately secure cash instead of stock).

As with plaintiffs' allegations regarding the Company's hedging activities, ***defendants do not address plaintiffs' allegation that defendants' omitted and/or misrepresented material information***

*concerning the due diligence (or lack thereof) performed on Exxon*.  Thus defendants in effect concede the sufficiency of plaintiffs' allegations on this point, dictating denial of the Motion.

### B.      The Pleading Standard for Claims Under §14(a) and Rule 14a-9 Has Been Met or Exceeded

Beyond challenging the materiality of certain of plaintiffs' alleged misstatements/omissions, defendants make generalized arguments regarding the necessary pleading standards.  Under any standard, however, plaintiffs have adequately stated a claim under §14(a) and Rule 14a-9.

To state a proxy claim, Plaintiffs need only allege: (1) "defendants misrepresented or omitted a material fact in a proxy statement"; (2) "defendants acted at least negligently in distributing the proxy statement"; and (3) "the false or misleading proxy statement was an essential link in causing the corporate actions." *In re Browning-Ferris Indus. S'holder Deriv. Litig.*, 830 F. Supp. 361, 365 (S.D. Tex. 1993).  "As a matter of law, the preparation of a proxy statement . . . containing materially false or misleading statements or omitting a material fact is sufficient to satisfy the [§14(a)] negligence standard." *Wilson v. Great Am. Indus.*, 855 F.2d 987, 995 (2d Cir. 1988). Plaintiffs have met this pleading burden.

As discussed above, the Complaint pleads specific material omissions and misrepresentations in a proxy statement.  As to some of these misrepresentations/omissions, defendants have conceded materiality by disclosing in the Amended Proxy much of the material information that forms the bases of plaintiffs' allegations.  As to others, defendants have made a limited challenge or no challenge of any sort.  But in no instance can it be argued that plaintiffs did not allege materiality of each alleged misstatement/omission.

As to all of the alleged misrepresentations/omissions, plaintiffs have also alleged that defendants acted at least negligently in omitting or misrepresenting this material information. *See* ¶69 (alleging that defendants "were at least negligent in filing the Proxy with . . . materially false and misleading statements"); *Wilson*, 855 F.2d at 995 ("the preparation of a proxy statement . . .

- 14 -

516238_1

containing materially false or misleading statements or omitting a material fact is sufficient to satisfy the [§14(a)] negligence standard"); *Beck v. Dombrowski*, 559 F.3d 680, 682 (7th Cir. 2009) ("Section 14(a) requires proof only that the proxy solicitation was misleading, implying at worst negligence by the issuer."). And, plaintiffs have adequately pled that the Proxy is an essential link in accomplishing the Merger. No more is required to state a claim under §14(a).

Unable to demonstrate that plaintiffs have not met the straightforward pleading requirements of §14(a), defendants claim that plaintiffs must somehow meet a "heightened" pleading standards under the PSLRA and Rule 9(b). Not true. The "heightened pleading requirements of the PSLRA and ***Rule 9(b)*** are not applicable to [Plaintiffs'] §14(a) claims." *See Washtenaw County Employees Ret. Sys. v. Wells Real Estate Inv. Trust, Inc.*, No. 1:07-CV-862-CAP, 2008 U.S. Dist. LEXIS 53652, at *27-*28 (N.D. Ga. Mar. 31, 2008) (emphasis in original); *see also Trendsetter Investors, LLC v. Hyperdynamics Corp.*, No. H-06-0746, 2007 U.S. Dist. LEXIS 3666, at *43 (S.D. Tex. Jan. 18, 2007) ("Neither the PSLRA (because scienter is not an essential element), nor ***Rule 9(b)*** (because fraud is not an essential element), apply to a ***Section 20(a)*** claim.") (emphasis in original).

However, even if pleading requirements for fraud claims under the PSLRA and Rule 9(b) did apply to plaintiffs' allegations, which allege negligence alone and thus do not require pleading of a particular state of mind, *see Beck*, 559 F.3d at 682 ("There is no required state of mind for a violation of section 14(a); a proxy solicitation that contains a misleading representation or omission violates the section even if the issuer believed in perfect good faith that there was nothing misleading in the proxy materials."), the Complaint is sufficiently well-plead. Pleading with particularity under the PSLRA and Rule 9(b) means only that the Complaint must specify "the statements (or omissions) considered to be fraudulent, the speaker, when and why the statements were made, and an explanation why they are fraudulent." *City of Clinton v. Pilgrim's Pride Corp.*, No. 4:09-CV-386-Y, 2009 U.S. Dist. LEXIS 117525, at *6-*7 (N. D. Tex. Nov. 23, 2009). Plaintiffs meet this

- 15 -

standard easily. Plaintiffs allege: (1) ("the who") defendants; (2) ("the what") omitted and/or misrepresented the material information specifically identified in the Complaint; (3) ("the where") from the Proxy; (4) ("the when") issued February 1, 2010; and (5) ("the why") to secure shareholder approval of the proposed merger between XTO and Exxon. *See* ¶¶1-3, 41-63.

But plaintiffs go further than that. Plaintiffs also identify specific Proxy provisions by page number that contain material omissions and misrepresentations and then explain specifically what material information should have been disclosed. *See, e.g.*, ¶¶42-46. For example, with respect to the discussion of Barclays' NAV analysis "on page 58 of the Proxy," plaintiffs allege defendants "fail to disclose (i) the specific adjustments that were made 'to reflect location and quality differentials'; (ii) the discount rate (or discount rates) used; and (iii) any information regarding the reserve, production and capital cost estimates used in the analysis." ¶61. Likewise, regarding "Barclays' Comparable Companies Analysis on page 58 of the Proxy," plaintiffs contend that defendants "fail to disclose: (i) a clear definition of discretionary cash flow, as used in this analysis; and (ii) how the value of XTO's hedge positions contributed to Barclays' value conclusions (if at all)." ¶62. Plaintiffs' allegations about the omissions regarding the "strategic alternatives available to" XTO and the "estimates of synergies that will flow to Exxon" from the merger excerpt relevant language from the Proxy, identify by page number the origin of the quoted material, specify material information omitted on the subject, and describe the importance of the omitted information. *See* ¶¶44-45, 57-60. Accordingly plaintiffs' particularized factual allegations are more than enough to satisfy the PSLRA's heightened pleading standards, *see Cent. Laborers' Pension Fund v. Integrated Elec. Servs.*, 497 F.3d 546, 550 (5th Cir. 2007); *City of Clinton*, 2009 U.S. Dist. LEXIS 117525, at *6-*7, thus belying defendants' assertion that plaintiffs have failed to identify with particularity which statements in the Proxy omit or misrepresent material information. *See* Defs. Motion at 6.

- 16 -

### C.    Plaintiffs State a Claim for Control Person Liability

To adequately plead a §20(a) claim, plaintiffs need only allege: (1) a primary violation by a controlled person; and (2) direct or indirect control of the primary violator by the defendant. *Trendsetter Investors*, 2007 U.S. Dist. LEXIS 3666, at *42. "In general, the determination of who is a controlling person . . . is an intensely factual question." *Arthur Children's Trust v. Keim*, 994 F.2d 1390, 1396 (9th Cir. 1993); *see also Hill York Corp. v. Am. Int'l Franchises, Inc.*, 448 F.2d 680, 694 n. 20 (5th Cir. 1971) ("'The issue of "control" is a complex fact question . . . .'"). Once control person liability is established, Defendants bear the burden of proving "the affirmative defense of lack of participation and good faith." *Southland*, 365 F.3d at 384 n.19.

Defendants are control persons because of their role as directors of the Company and their direct participation in the creation and dissemination of the Proxy.[11] ¶¶74-76, 78-79, 81. *See Salit v. Stanley Works*, 802 F. Supp. 728, 734-35 (D. Conn. 1992) ("In light of the broad construction given to the term 'controlling person,' directors are found necessarily to have some 'indirect means of influence' over the corporation and the managers thereof."); *In re Storage Tech. Corp. Sec. Litig.*, 630 F. Supp. 1072, 1079 (D. Colo. 1986); *Am. Gen. Ins. Co. v. Equitable Gen. Corp.*, 493 F. Supp. 721, 752 (E.D. Va. 1980). Defendants, among other things, received or had unlimited access to the Proxy and had the ability to prevent the Proxy's issuance or to cause the omission and misrepresentations in the Proxy to be corrected. ¶75. Defendants, other than Randall who abstained,

---

[11]    Plaintiffs need not, as defendants contend, "allege facts from which it can be inferred that each defendants had the authority to control, and actually exercised control, over some controlled person." Defs. Motion at 17-18 (citing *Rich v. Maidstone Fin., Inc.*, No. 98 Civ. 2569 (DAB), 2001 U.S. Dist. LEXIS 3167 (S.D.N.Y. Mar. 23, 2001)). In the Fifth Circuit, "actual exercise of control and/or participation in a violation of [the securities law] need not be alleged." *In re Dynegy, Inc.*, 339 F. Supp. 2d 804, 877 (S.D. Tex. 2004); *see G.A. Thompson & Co. v. Partridge*, 636 F.2d 945, 957-58 (5th Cir. 1981). Plaintiffs, as they have done, need only allege "the control person had the power to control the controlled person or to influence corporate policy." *Dynegy*, 339 F. Supp. 2d at 877.

provided unanimous recommendation for the Merger and thus were "directly involved in the making of" the Proxy. ¶¶40, 76. In accordance with the merger agreement, they were obligated to discover and correct any material misstatement or omission in the Proxy. ¶79. Defendants thus possessed "the power to influence" XTO's operations and activities regarding the Proxy and therefore meet the definition of a control person. *See Trendsetter Investors*, 2007 U.S. Dist. LEXIS 3666, at *79.

Such well-grounded and particularized allegations cannot be characterized as improper "group pleading," as defendants suggest. In the Fifth Circuit, control person allegations need "be pleaded only in accordance with Rule 8(a)." *Trendsetter Investors*, 2007 U.S. Dist. LEXIS 3666, at *43.[12] Plaintiffs' allegations are more than sufficient to meet this standard.

Moreover, it is irrelevant to the analysis under §20(a) that plaintiffs did not name XTO as a defendant. Even if XTO is viewed as a primary violater (an open question as Exxon, not XTO, is the issuer of the Proxy and the Amended Proxy), control person liability may be asserted without suing the primary violator. *See SEC v. Savoy Indus., Inc.*, 587 F.2d 1149, 1170 n.47 (D.C. Cir. 1978). "Nothing in the language of ***section 20(a)*** compels the presence of the controlled person whose misdeeds are sought to be attributed to the defendants charged to be controlling persons." *Keys v. Wolfe,* 540 F. Supp. 1054, 1062 (N.D. Tex. 1982), *rev'd on other grounds*, 709 F.2d 413 (5th Cir. 1983) (emphasis in original). Thus, in accordance with the foregoing analysis, because plaintiffs have adequately alleged a primary violation of §14(a), plaintiffs have also adequately alleged defendants' liability under §20(a).

---

[12]    Defendants' reliance on *Pedroli v. Bartek*, 564 F. Supp. 2d 683 (E.D. Tex. 2008) is misplaced. Group pleading was not allowed in that case because the proxy claims in that case were grounded in fraud. *See id.* at 687. Where as here, proxy claims are based in negligence, group pleading is permissible. *See In re Thornburg Mortgage Sec. Litig.*, No. CIV 07-0815 JB/WDS, 2010 U.S. Dist. LEXIS 13375, at *89 (D.N.M. Jan. 27, 2010).

IV.     **CONCLUSION**

For the foregoing reasons, defendants' Motion should be denied.  Were the Court to find any

of their allegations deficient, Plaintiffs request leave to amend.

DATED:  April 12, 2010                    Respectfully submitted,

ROBBINS GELLER RUDMAN
  & DOWD LLP
RANDALL J. BARON
California State Bar No. 150796
randyb@rgrdlaw.com
DAVID T. WISSBROECKER
California State Bar No. 243867
dwissbroecker@rgrdlaw.com


                                          DAVID T. WISSBROECKER

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

KENDALL LAW GROUP, LLP
JOE KENDALL
Texas State Bar No. 11260700
jkendall@kendalllawgroup.com
HAMILTON LINDLEY
Texas State Bar No. 24044838
hlindley@kendalllawgroup.com
3232 McKinney Avenue, Suite 700
Dallas, TX  75204
Telephone:  214/744-3000
214/744-3015 (fax)

MURRAY, FRANK & SAILER LLP
BRIAN P. MURRAY
New York State Bar No. 2388494
bmurray@murrayfrank.com
275 Madison Avenue, Suite 801
New York, NY  10016
Telephone:  212/682-1818
212/682-1892 (fax)

- 19 -

BARON & BUDD, P.C.
BRUCE STECKLER
Texas State Bar No. 00785039
bsteckler@baronbudd.com
KELLY REDDELL
Texas State Bar No. 12618250
kreddell@baronbudd.com
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX  75219
Telephone:  214/521-3605
214/520-1181(fax)

JOHNSON BOTTINI, LLP
FRANK J. JOHNSON
California State Bar No. 174882
frankj@johnsonbottini.com
FRANCIS A. BOTTINI, JR.
California State Bar No. 175783
frankb@johnsonbottini.com
BRETT M. WEAVER
California State Bar No. 204715
brett@johnsonbottini.com
501 West Broadway, Suite 1720
San Diego, CA  92101
Telephone:  619/230-0063
619/238-0622 (fax)

STANLEY•IOLA, LLP
MARC R. STANLEY
Texas State Bar No. 19046500
mstanley@smi-law.com
MARTIN WOODWARD
Texas State Bar No. 00797693
mwoodward@smi-law.com
310 Monticello Ave., Ste. 750
Dallas, TX  75205
Telephone:  214/443-4301
214/447-9469 (fax)

516238_1

BRANSTETTER, STRANCH &
  JENNINGS, PLLC
JAMES G. STRANCH, III
Tennessee State Bar No. 002542
jims@branstetterlaw.com
J. GERARD STRANCH, IV
Tennessee State Bar No. 023045
gerards@branstetterlaw.com
STEVEN J. SIMERLEIN
Tennessee State Bar No. 027762
ssimerlein@branstetterlaw.com
227 Second Avenue North, 4th Floor
Nashville, TN  37201-1631
Telephone:  615/254-8801
615/255-5419 (fax)

DOYLE LOWTHER LLP
WILLIAM J. DOYLE II
California State Bar No. 188069
bill@doylelowther.com
JOHN LOWTHER
California State Bar No. 188069
john@doylelowther.com
JAMES HAIL
California State Bar No. 207000
jim@doylelowther.com
9466 Black Mountain Road, Suite 210
San Diego, CA  92126
Telephone:  619/573-1700
888/710-6866 (fax)

ROBBINS UMEDA LLP
BRIAN J. ROBBINS
California State Bar No. 190264
brobbins@robbinsumeda.com
S. BENJAMIN ROZWOOD
California State Bar No. 181474
brozwood@robbinsumeda.com
ARSHAN AMIRI
California State Bar No. 246874
aamiri@robbinsumeda.com
DAN R. FORDE
California State Bar No. 248461
dforde@robbinsumeda.com
DAVID L. MARTIN
California State Bar No. 253858
dmartin@robbinsumeda.com
600 B Street, Suite 1900
San Diego, CA  92101
Telephone:  619/525-3990
619/525-3991 (fax)

THE WEISER LAW FIRM, PC
DEBRA S. GOODMAN
Pennsylvania State Bar No. 49977
dsg@weiserlawfirm.com
HENRY J. YOUNG
Pennsylvania State Bar No. 204669
hjy@weiserlawfirm.com
121 North Wayne Avenue, Suite 100
Wayne, PA  19087
Telephone:  610/225-0273
610/225-2678 (fax)

- 22 -

516238_1

SCHWARTZ, JUNELL, GREENBERG &
   OATHOUT, LLP
ROGER B. GREENBERG
Texas State Bar No. 08390000
rgreenberg@schwartz-junell.com
THANE TYLER SPONSEL III
Texas State Bar No. 24056361
tsponsel@schwartz-junell.com
Two Houston Center
909 Fannin, Suite 2700
Houston, TX  77010
Telephone:  713/752-0017
713/752-0327

SCHWARZWALD McNAIR & FUSCO LLP
EBEN O. McNAIR IV
Ohio State Bar No. 0026049
emcnair@smcnlaw.com
616 Penton Media Building
1300 East Ninth Street
Cleveland, OH  44114-1503
Telephone:  216/566-1600
216/566-1814 (fax)

Attorneys for Plaintiffs

CERTIFICATE OF SERVICE

I hereby certify that on April 12, 2010, I electronically filed the foregoing with the Clerk of

the Court using the CM/ECF system which will send notification of such filing to the e-mail

addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have

mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF

participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.  Executed on April 12, 2010.

s/ David T. Wissbroecker
DAVID T. WISSBROECKER

ROBBINS GELLER RUDMAN
& DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:  dwissbroecker@rgrdlaw.com

# Mailing Information for a Case 4:09-cv-00768-Y

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Arshan Amiri**
  aamiri@robbinsumeda.com

- **Randall J Baron**
  randyb@rgrdlaw.com

- **Lars L Berg**
  lars.berg@khh.com,mary.ann.keller@khh.com,sherry.ethridge@khh.com

- **Francis A Bottini , Jr**
  frankb@johnsonbottini.com

- **Willie Briscoe**
  wbriscoe@thebriscoelawfirm.com

- **William J Doyle , II**
  bill@doylelowther.com

- **Donald J Enright**
  denright@finkelsteinthompson.com

- **Daniel R Forde**
  dforde@robbinsumeda.com

- **Sharon F Fulgham**
  sharon.fulgham@kellyhart.com,donna.heinrich@kellyhart.com,sherry.ethridge@kellyhart.com

- **Debra S Goodman**
  dsg@weiserlawfirm.com

- **Robert C Grable**
  bob.grable@khh.com,gloria.mcgowan@khh.com

- **Roger B Greenberg**
  rgreenberg@schwartz-junell.com,sdoring@schwartz-junell.com

- **Donald E Herrmann**
  donald_herrmann@khh.com,sherry_ethridge@khh.com,donna_heinrich@khh.com

- **Frank J Johnson**
  frankj@johnsonbottini.com

- **Joe Kendall**
  administrator@kendalllawgroup.com,jkendall@kendalllawgroup.com

- **Hamilton Lindley**
  hlindley@kendalllawgroup.com,administrator@kendalllawgroup.com

- **David L Martin**
  dmartin@robbinsumeda.com

- **Brian P Murray**
  bmurray@murrayfrank.com

- **Kelly N Reddell**
  kreddell@baronbudd.com,bjoe@baronbudd.com,lweaver@baronbudd.com

- **Brian J Robbins**
  notice@robbinsumeda.com,mozaki@robbinsumeda.com

- **S Benjamin Rozwood**
  brozwood@robbinsumeda.com

- **Charles W Schwartz**
  noelle.reed@skadden.com,dockethouston@skadden.com,charles.schwartz@skadden.com,daniel.bolia@skadden.com

- **Steven J Simerlein**
  ssimerlein@branstetterlaw.com

- **Thane Tyler Sponsel , III**
  tsponsel@schwartz-junell.com,cubberud@schwartz-junell.com

- **Marc R Stanley**
  marcstanley@mac.com,cgiddens@stanleyiola.com,bmarks@stanleyiola.com

- **Bruce William Steckler**
  bsteckle@baronbudd.com,bjoe@baronbudd.com,lweaver@baronbudd.com

- **J Gerard Stranch , IV**
  gerards@branstetterlaw.com,tharris@branstetterlaw.com

- **James G Stranch , III**
  jims@branstetterlaw.com,cbatey@branstetterlaw.com

- **Elizabeth K Tripodi**
  etripodi@finkelsteinthompson.com

- **David T Wissbroecker**
  dwissbroecker@rgrdlaw.com

- **Martin Woodward**
  mwoodward@stanleyiola.com,cgiddens@stanleyiola.com,bmarks@stanleyiola.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- `(No manual recipients)`