**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**

| | |
|---|---|
| JAMES R. HARRISON and WALT SCHUMANN, Individually and On Behalf of All Others Similarly Situated,<br><br>                  Plaintiffs,<br>    vs.<br><br>XTO ENERGY INC., BOB R. SIMPSON, KEITH A. HUTTON, VAUGHN O. VENNERBERG II, WILLIAM H. ADAMS, III, LANE G. COLLINS, PHILLIPS R. KEVIL, JACK P. RANDALL, SCOTT G. SHERMAN, HERBERT D. SIMONS, LOUIS G. BALDWIN, TIMOTHY L. PETRUS and GARY D. SIMPSON, EXXONMOBIL INVESTMENT CORPORATION and EXXON MOBIL CORPORATION, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

C.A. No. 4-09-CV-768-Y

Consolidated with C.A. No. 4-10-CV-007-Y

**SECOND AMENDED CLASS ACTION COMPLAINT**

Plaintiffs James R. Harrison and Walt Schumann ("Plaintiffs"), by their attorneys, allege upon information and belief, except for their own acts, which are alleged on knowledge, as follows:

**INTRODUCTION**

1.      Plaintiffs bring this action on behalf of the public stockholders of XTO Energy, Inc. ("XTO" or the "Company") against Defendants XTO and its Board of Directors seeking equitable relief for their breaches of fiduciary duty and other violations of state law arising out of their attempt to sell the Company to Defendants Exxon Mobil Corporation and ExxonMobil Investment Corporation (collectively "Exxon") for 0.7098 shares of Exxon common stock for

each share of XTO common stock (the "Proposed Transaction").  Defendants have breached their fiduciary duties by approving the Proposed Transaction at an unfair price, via an unfair process and without adequate disclosure. The Proposed Transaction is valued at approximately $41 billion.

2.      Plaintiffs' Amended Complaint, filed with this Court on February 5, 2010 (the "Amended Complaint") alleged that the Form S-4 Registration Statement (the "Registration Statement") filed by Exxon on February 1, 2010 failed to provide the Company's shareholders with material information and/or provides them with materially misleading information thereby rendering the shareholders unable to make an informed decision on whether to vote in favor of the Proposed Transaction.  The Amended Complaint alleged that specific information had been omitted from the Registration Statement and needed to be disclosed so that shareholders would not be harmed.

3.      Recognizing the validity of Plaintiffs' allegations regarding these specific material misrepresentations and omissions, on March 24, 2010, Exxon filed with the SEC Amendment No. 1 to Form S-4 Registration Statement (the "Amended Registration Statement"). The Amended Registration Statement disclosed much of the specific information that Plaintiffs had alleged was omitted from the previous Registration Statement.  Exxon filed this Amended Registration Statement while Plaintiffs' Amended Complaint was pending, prior to this Court's April 8, 2010 dismissal without prejudice of the Amended Complaint for failure to properly plead subject matter jurisdiction.

**JURISDICTION AND VENUE**

4.      This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332. Plaintiffs and class members have a common and undivided claim and therefore, through aggregation, clearly exceed the $75,000 jurisdictional threshold.  Plaintiffs cannot adjudicate

their claim without implicating the rights of all other shareholders.  There are approximately 580 million shares of XTO currently issued and outstanding and trading at $48.14, yielding a market capitalization for the Company of approximately $28 billion.  Further, the total value of the Proposed Transaction is approximately $41 billion.  There is complete diversity of citizenship between plaintiffs and the defendants. Plaintiff Walt Schumann is a citizen of Pennsylvania and Plaintiff James R. Harrison is a citizen of Maryland.  All Defendants, as set forth specifically below, are citizens of the State of Texas.

5.     Venue is proper in this District because many of the acts and practices complained of herein occurred in substantial part in this District.  In addition, XTO maintains its principal executive offices in Forth Worth, Texas.

**PARTIES**

6.     Plaintiff Walt Schumann, a citizen of Pennsylvania, is, and has been at all relevant times, the owner of shares of common stock of XTO.  Plaintiff James R. Harrison, a citizen of Maryland, is, and has been at all relevant times, the owner of shares of common stock of XTO.

7.     XTO is a corporation organized and existing under the laws of the State of Delaware. It maintains its principal corporate offices at 810 Houston Street, Fort Worth, Texas, 76102, and engages in the acquisition, development, exploitation, and exploration of producing oil and gas properties in the United States. The Company also engages in the production, processing, marketing, and transportation of oil and natural gas. The Company's properties are concentrated in Texas, Arkansas, Montana, Louisiana, Oklahoma, New Mexico, Utah, Kansas, West Virginia, Colorado, Wyoming, Pennsylvania, and North Dakota.  As of December 31, 2008, the Company had estimated proved reserves of 11.80 trillion cubic feet of natural gas, 76 million barrels of natural gas liquids, and 268 million barrels of oil, and owned interests in

18,235.7 net producing wells.   XTO markets its natural gas to brokers, local distribution companies, and end-users.

8.        Defendant Bob Simpson ("B. Simpson") has been Chairman of the Board of the Company since 2008. Simpson is a founder of XTO and has served as Chief Executive Officer of the Company from 1986 to December 2008.  He is a citizen of the State of Texas.

9.        Defendant Keith Hutton ("Hutton") has been Chief Executive Officer of the Company since 2008 and has served as a director of the Company since 2005.  He is a citizen of the State of Texas.

10.        Defendant Vaughn Vennerberg ("Vennerberg") has been the President and a director of the Company since 2008.  He is a citizen of the State of Texas.

11.        Defendant Louis Baldwin ("Baldwin") has been the Chief Financial Officer, Executive Vice President, and an advisory director of the Company since 2000.  He is a citizen of the State of Texas.

12.        Defendant Timothy Petrus ("Petrus") has been the Executive Vice President – Acquisition and an advisory director of the Company since 2005.  He is a citizen of the State of Texas.

13.        Defendant Scott Sherman ("Sherman") has been a director of the Company since 1990.  He is a citizen of the State of Texas.

14.        Defendant Jack Randall ("Randall") has been a director of the Company since 1997.  He is a citizen of the State of Texas.

15.        Defendant William Adams ("Adams") has been a director of the Company since 2001.  He is a citizen of the State of Texas.

16.     Defendant Herbert Simons ("Simons") has been a director of the Company since 2000.  He is a citizen of the State of Texas.

17.     Defendant Philip Kevil ("Kevil") has been a director of the Company since 2004. He is a citizen of the State of Texas.

18.     Defendant Lane Collins ("Collins") has been a director of the Company since 2005.  He is a citizen of the State of Texas.

19.     Defendant Gary Simpson ("G. Simpson") has been an advisory director of the Company since 2008.  He is a citizen of the State of Texas.

20.     Defendants referenced in ¶¶ 8 through 19 are collectively referred to as Individual Defendants and/or the XTO Board. The Individual Defendants as officers and/or directors of XTO, have a fiduciary relationship with Plaintiffs and other public shareholders of XTO and owe them the highest obligations of good faith, fair dealing, loyalty and due care.

21.     Defendant Exxon Mobil Corporation is a New Jersey corporation with its headquarters located in Texas that engages in the exploration, production, transportation, and sale of crude oil and natural gas.

22.     Defendant ExxonMobil Investment Corporation is a Delaware corporation wholly owned by Exxon Mobil Corporation that was created for the purposes of effectuating the Proposed Transaction.  ExxonMobil Investment Corporation's principal place of business for the purpose of effectuating the Proposed Transaction is in Texas.

## INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES

23.     By reason of Individual Defendants' positions with the Company as officers and/or directors, they are in a fiduciary relationship with Plaintiffs and the other public

5

shareholders of XTO and owe them, as well as the Company, a duty of highest good faith, fair dealing, loyalty and full, candid and adequate disclosure.

24.     Where the officers and/or directors of a publicly traded corporation undertake a transaction that will result in either: (i) a change in corporate control; (ii) a break up of the corporation's assets; or (iii) sale of the corporation, the directors have an affirmative fiduciary obligation to obtain the highest value reasonably available for the corporation's shareholders, and if such transaction will result in a change of corporate control, the shareholders are entitled to receive a significant premium.  To diligently comply with their fiduciary duties, the directors and/or officers may not take any action that:

(a)     adversely affects the value provided to the corporation's shareholders;

(b)     favors themselves or will discourage or inhibit alternative offers to purchase control of the corporation or its assets;

(c)     contractually prohibits them from complying with their fiduciary duties;

(d)     will otherwise adversely affect their duty to search and secure the best value reasonably available under the circumstances for the corporation's shareholders; and/or

(e)     will provide the directors and/or officers with preferential treatment at the expense of, or separate from, the public shareholders.

25.     In accordance with their duties of loyalty and good faith, the Individual Defendants, as Directors and/or officers of XTO, are obligated to refrain from:

(a)     participating in any transaction where the directors or officers' loyalties are divided;

6

(b)     participating in any transaction where the directors or officers receive, or are entitled to receive, a personal financial benefit not equally shared by the public shareholders of the corporation; and/or

(c)     unjustly enriching themselves at the expense or to the detriment of the public shareholders.

26.     Plaintiffs allege herein that the Individual Defendants, separately and together, in connection with the Proposed Transaction are knowingly or recklessly violating their fiduciary duties, including their duties of loyalty, good faith and independence owed to Plaintiffs and other public shareholders of XTO, or are aiding and abetting others in violating those duties.

27.     Defendants also owe the Company's stockholders a duty of candor, which includes the disclosure of all material facts concerning the Proposed Transaction and, particularly, the fairness of the price offered for the stockholders' equity interest.  Defendants are knowingly or recklessly breaching their fiduciary duties of candor by failing to disclose all material information concerning the Proposed Transaction, and/or aiding and abetting other Defendants' breaches.

### CONSPIRACY, AIDING AND ABETTING AND CONCERTED ACTION

28.     In committing the wrongful acts alleged herein, each of the Defendants has pursued, or joined in the pursuit of, a common course of conduct, and acted in concert with and conspired with one another, in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Defendants further aided, abetted and/or assisted each other in breach of their respective duties as herein alleged.

29.     During all relevant times hereto, the Defendants, and each of them, initiated a course of conduct which was designed to and did: (i) permit Exxon to attempt to eliminate the public shareholders' equity interest in XTO pursuant to a defective sales process, and (ii) permit

7

Exxon to buy the Company for an unfair price. In furtherance of this plan, conspiracy and course of conduct, Defendants, and each of them, took the actions as set forth herein.

30. Each of the Defendants herein aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions, as particularized herein, to substantially assist the commission of the wrongdoing complained of, each Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to, and furtherance of, the wrongdoing.  The Defendants' acts of aiding and abetting included, *inter alia*, the acts each of them are alleged to have committed in furtherance of the conspiracy, common enterprise and common course of conduct complained of herein.

## CLASS ACTION ALLEGATIONS

31. Plaintiffs bring this action on their own behalf and as a class action on behalf of all owners of XTO common stock and their successors in interest, except Defendants and their affiliates (the "Class").

32. This action is properly maintainable as a class action for the following reasons:

(a) the Class is so numerous that joinder of all members is impracticable.  As of December 15, 2009, XTO has approximately 580.34 million shares outstanding.

(b) questions of law and fact are common to the Class, including, inter alia, the following:

(i) Have the Individual Defendants breached their fiduciary duties owed by them to Plaintiffs and the others members of the Class;

8

     (ii)    Are the Individual Defendants, in connection with the Proposed Transaction of XTO by Exxon, pursuing a course of conduct that is in violation of their fiduciary duties;

     (iii)    Have the Individual Defendants misrepresented and omitted material facts in violation of their fiduciary duties owed by them to Plaintiffs and the other members of the Class;

     (iv)    Have XTO and Exxon aided and abetted the Individual Defendants' breaches of fiduciary duty; and

     (v)    Is the Class entitled to injunctive relief or damages as a result of Defendants' wrongful conduct.

     (c)    Plaintiffs are committed to prosecuting this action and have retained competent counsel experienced in litigation of this nature.

     (d)    Plaintiffs' claims are typical of those of the other members of the Class.

     (e)    Plaintiffs have no interests that are adverse to the Class.

     (f)    The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications for individual members of the Class and of establishing incompatible standards of conduct for Defendants.

     (g)    Conflicting adjudications for individual members of the Class might as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

## FURTHER SUBSTANTIVE ALLEGATIONS

33.     Prior to the recession and the general financial turmoil that began in late 2008, XTO's stock had been trading at over $70 per share in 2008.  XTO saw its stock price take a hit in late 2008 and in 2009 likely due to the recession and general turmoil in the financial markets.

34.     XTO, however, has since rebounded and is poised for substantial growth.

35.     On August 5, 2009, the Company announced its results for the second quarter of 2009. Among the financial highlights, the Company reported:

- Record production for the quarter of 2.89 billion cubic feet equivalent (Bcfe) per day, up 32% from the same quarter in 2008, and up 6% sequentially from the first quarter of 2009.

- Revenues of $2.27 billion, a 17% increase from $1.94 billion the prior year.

36.     Chairman of the Board and founder Defendant B. Simspson commented on the Company's outstanding quarter and looked forward to a successful 2010. As stated in the press release:

> XTO's **outstanding results** highlight the wisdom of the Company's time-tested strategy — own quality properties, manage robust cash flow and plan for expansive growth. Once again, **record production exceeded expectations**, increasing 6% sequentially, and 32% from last year. With strong cash flow margins and 75% of second half production hedged at an equivalent price of $10.69 per Mcfe, operating cash flow for 2009 is headed towards a record $6 billion," stated Bob R. Simpson, Chairman and Founder. "**Looking ahead to 2010, we anticipate a recovering economy, decreasing natural gas supply and increasing natural gas demand.** Through our hedging program, the Company has already secured an equivalent price of $11.33 per Mcfe on about 40% of expected production. With these convictions, XTO is increasing its 2009 production growth target to 20%, from 16%, while modestly increasing our capital budget to $3.6 billion."

37.     The Company continued its success in the third quarter.  On November 4, 2009, the Company announced its results for the third quarter of 2009.  The Company announced

*record* production, revenues and cash flow in the quarter. As stated in the press release announcing the results:

> FORT WORTH, TX (November 4, 2009) – XTO Energy Inc. (NYSE-XTO) today *reported record third quarter 2009 production of 2.95 billion cubic feet equivalent (Bcfe) per day*, up 23% from the third quarter 2008 level of 2.39 Bcfe per day, and up 2% sequentially from 2.89 Bcfe per day in second quarter 2009. *Total revenues for the third quarter were a record $2.29 billion*, an 8% increase from $2.13 billion the prior year. . .Operating cash flow was a record $1.56 billion, up 3% from 2008 third quarter comparable operating cash flow of $1.52 billion.

38.     In the press release announcing the results, XTO Chairman of the Board and founder Defendant B. Simpson commented on the Company's record quarter, and looked forward to 2010, anticipating *double-digit production growth*, *strong financial returns*, and *substantial free cash flow*.  In addition, Defendant Hutton noted that the Company will be able to efficiently exploit their low-cost drilling inventory for years to come. As stated in the press release:

> "Notwithstanding volatile natural gas markets, XTO reported another quarter of record production and cash flow, demonstrating our ability to grow efficiently through the cycles. The impact of our 2008 investment and our 2009 capital program was evident during the quarter. Our disciplined internal focus on costs and returns leave us on track for cash flow near $6 billion, more than 15% above year ago levels," stated Bob R. Simpson, Chairman and Founder. "*Looking towards 2010, with about 55% of our anticipated production already hedged at $9.62 per Mcfe, we expect to deliver another year of strong financial returns and substantial free cash flow, while generating double-digit production growth*."
>
> "Our robust production growth of 23%, 13% through the drill-bit, is a testament to both the strength of our operating teams and the underlying asset base. The Company's Mid-Continent production grew 23% over the second quarter, driven by our success in the Fayetteville and Woodford shales. In the Fayetteville, daily gross operated production is now above 100 MMcfe; including our significant non-operated position, net quarterly production jumped more than 90 MMcfe year-over-year. In the Freestone Trend, gross operated daily production set another quarterly record, increasing 3% sequentially to 816 MMcf with strong results from the Farrar and Bald Prairie fields," commented Keith A. Hutton, Chief Executive Officer. "Our Haynesville Shale program is going to six rigs, with two rigs in the Shelby, Nacogdoches, and San Augustine County area, two in

11

Panola County and two in Louisiana. Our first well in Louisiana, the recently completed McMichael #2 averaged 14.5 MMcfe/d over a two-week period. We expect to exit 2009 at a 60 to 70 MMcfe/d rate from this prolific play. In the Barnett Shale, we are holding production flat at about 610 MMcfe/d (net) while running only nine rigs against our core acreage position. In the Bakken Shale, we have drilled 19 wells year-to-date in the Three Forks-Sanish play, completing another five in the quarter each with daily peak rates over 1,000 BOE, including our recently announced Jorgenson well (2,827 BOE per day). *We plan to double our rig count to six in 2010.* Our early success in the Marcellus Shale has encouraged us to add a second rig *and we expect to double our rig count in 2010*. Simply put, our substantial acreage position across the major shale plays, in addition to our base conventional acreage, leaves us with a deep, low-cost drilling inventory *which we expect to efficiently exploit for years to come*," continued Hutton.

39.    Despite its promise and poise for growth, the Company agreed to enter into the Proposed Transaction.  In a press release dated December 14, 2009, the Company announced that it had entered into a merger agreement with Exxon, stating:

IRVING, TX – Exxon Mobil Corporation and XTO Energy Inc. announced today an all-stock transaction valued at $41 billion. The agreement, which is subject to XTO stockholder approval and regulatory clearance, will enhance ExxonMobil's position in the development of unconventional natural gas and oil resources.

Under the terms of the agreement, approved by the boards of directors of both companies, ExxonMobil has agreed to issue 0.7098 common shares for each common share of XTO. This represents a 25 percent premium to XTO stockholders. The transaction value includes $10 billion of existing XTO debt and is based on the closing share prices of ExxonMobil and XTO on December 11, 2009.

40.    Based on the closing price of Exxon common stock on December 11, 2009, the Proposed Transaction was valued at $51.69 per share of XTO common stock.  As of February 2, 2010, the Proposed Transaction is valued at $47.53 based on the closing price of Exxon common stock.

41.    Given the Company's recent strong performance and future prospect for 2010 and beyond, the consideration shareholders are to receive is inadequate. Further, 22 analysts had a mean price target of $54.05 per share for XTO common stock, and at least one Wall Street

analyst had a price target of $80.00 per share before the Proposed Transaction was announced. Accordingly, Exxon is picking up XTO at the most opportune time, at a time when XTO is poised for growth and its stock price is trading at a huge discount to its intrinsic value.

42.    The Proposed Transaction represents an effort by Defendants to aggrandize their own financial position and interests to the detriment of the Company's shareholders.   In connection with the Proposed Transaction, Defendants B. Simpson, Hutton, Vennerberg, Baldwin and Petrus (the "Officer directors") hold unvested shares of XTO stock that will automatically vest upon consummation of the Merger Agreement. The following table shows the amount of unvested shares held by each such Officer director:

| Name | Number of Unvested Performance Shares that Will Vest upon Completion of the Merger | Number of Shares Subject to Outstanding Unvested Stock Options that Will Vest upon Completion of the Merger | Weighted Average Exercise Price per Share ($) |
|---|---|---|---|
| Bob R. Simpson | 215,000 | 455,269 | 55.20 |
| Keith A. Hutton | 114,000 | 788,665 | 49.08 |
| Vaughn O. Vennerberg, II | 68,500 | 557,086 | 49.10 |
| Louis G. Baldwin | 37,000 | 258,850 | 50.05 |
| Timothy L. Petrus | 35,500 | 230,540 | 50.41 |

43.    In addition, each of the Officer directors entered into consulting agreements with the Company and Exxon (the "Consulting Agreements") which were executed on December 13, 2009. Pursuant to the Consulting Agreements, following consummation of the Proposed Transaction, each of the Officer directors will serve the Company as a consultant on a full time

basis. The Company will provide each of the Officer directors with an annual consulting fee equal to approximately: $1,800,000 for B. Simpson; $700,000 for Hutton, $450,000 for Vennerberg; $250,000 for Baldwin; and $237,500 for Petrus. Each of the Officer directors will also be entitled to receive an annual cash bonus equal to approximately: $1,800,000 for B. Simpson; $700,000 for Hutton, $450,000 for Vennerberg; $250,000 for Baldwin; and $237,500 for Petrus. Also under the Consulting Agreements, Exxon has agreed to provide each of the Officer directors with a one-time grant of restricted Exxon common stock or stock units having a grant date fair market value equal to $3,600,000 for B. Simpson; $1,400,000 for Hutton; $900,000 for Vennerberg; $500,000 for Baldwin; and $475,000 for Petrus.

44.     In addition, B. Simpson will receive pursuant to his consulting agreement, a lump sum cash payment within five days after the Proposed Transaction in an amount equal to $10,800,000 (in lieu of what B. Simpson would have received in a change of control pursuant to his employment agreement with the Company). B. Simpson will also be entitled to receive a retention payment, payable in equal installments at six and twelve months after the Proposed Transaction, generally subject to B. Simpson's continued performance of consulting services through the payment date. B. Simpson's retention payment, which relates to his annual grant of the Company's common stock, will equal up to $24,750,000.   Moreover, Hutton, Vennerberg, Baldwin will each receive retention payments (in lieu of what they would have received in a change of control pursuant to their employment agreement with the Company), payable in equal installments at six and twelve months after the Proposed Transaction, generally subject to their continued performance of consulting services to the payment date. The payments will equal an amount up to the following: Hutton, $10,913,662; Vennerberg, $6,172,817; and Mr. Baldwin, $2,591,527.

14

45.    In addition, each of the Officer directors will receive shares of the Company's common stock immediately prior to the completion of the Proposed Transaction (in lieu of certain lump sum cash payments they would be entitled to receive in a change of control pursuant to their Grants Agreements with the Company) equal to: 833,333 shares for B. Siimpson; 687,500 shares for Hutton; 583,333 shares for Vennerberg; 166,667 shares for Baldwin; and 156,250 shares for Petrus.

46.    Lastly, each of the non-employee directors of the Company own 4,166 shares of restricted stock that upon consummation of the Proposed Transaction will no longer be subject to restrictions and will be converted into a right to receive 0.7098 shares of Exxon common stock. Accordingly, each non-employee director will receive approximately $215,340 upon consummation of the Proposed Transaction.

**FLAWED SALES PROCESS AND PRECLUSIVE DEAL PROTECTION DEVICES**

47.    Moreover, the Company agreed to enter into the Proposed Transaction without conducting a market check to seek other potential acquirers.  From August 2009, when XTO and Exxon first began discussions regarding a potential transaction, until the announcement of the Proposed Transaction on December 14, 2009, not a single party was solicited by XTO to gauge their interest in a potential transaction.  In fact, the Schedule 14A filed with the SEC on April 13, 2010 (the "Definitive Proxy") definitely states that XTO failed to conduct a market check.  The Company reasoned that "conducting a market check could interfere with or distract from the operation of the business."  Definitive Proxy at 48.  The Company also admits that seeking other potential strategic alternatives posed the risk of "causing ExxonMobil to delay or terminate discussions with XTO regarding the merger. *Id.*  Moreover, as discussed below, the Company entered into a non-solicitation provision preventing the Board from soliciting third parties

following the execution of the merger agreement. Accordingly, the sales process conducted by the Company is flawed.

48. On December 14, 2009, the Company filed a Form 8-K with the United States Securities and Exchange Commission ("SEC") wherein it disclosed the operating Agreement and Plan of Merger for the Proposed Transaction (the "Merger Agreement"). As part of the Merger Agreement, Defendants, to protect their own self interests, agreed to certain onerous and preclusive deal protection devices that operate conjunctively to make the Proposed Transaction a *fait accompli* and ensure that no competing offers will emerge for the Company.

49. Among other unduly restrictive provisions, §6.03(a) of the Merger Agreement includes a "no solicitation" provision barring the Board and any Company personnel from attempting to procure a price in excess of the amount offered by Exxon. This section also demands that the Company terminate any and all prior or on-going discussions with other potential suitors. Despite the fact that they have locked up the Company and bound it to not solicit alternative bids, the Merger Agreement provides other ways that effectively guarantee the only suitor will be Exxon.

50. Pursuant to §6.03 of the Merger Agreement, should an unsolicited bidder arrive on the scene, the Company must notify Exxon of the bidder's offer. Thereafter, should the Board determine that the unsolicited offer is superior, Exxon is granted three business days to amend the terms of the Merger Agreement to make a counter-offer that needs only to be at least as favorable to the Company's shareholders as the unsolicited offer. Exxon is able to match the unsolicited offer because it is granted unfettered access to the unsolicited offer, in its entirety, eliminating any leverage that the Company has in receiving the unsolicited offer.

16

51.     In other words, the Merger Agreement gives Exxon access to any rival bidder's information and allows Exxon a free right to top any superior offer.  Accordingly, no rival bidder is likely to emerge and act as a stalking horse for XTO, because the Merger Agreement unfairly assures that any "auction" will favor Exxon and piggy-back upon the due diligence of the foreclosed second bidder.

52.     In addition, should the other bidder come unsolicited and overcome the "last look," the Merger Agreement provides XTO must pay a termination fee of $900 million to Exxon if the Company decides to pursue the other offer, thereby essentially requiring that the alternate bidder agree to pay a naked premium for the right to provide XTO's shareholders with a superior offer.

53.     Ultimately, the preclusive deal protection provisions illegally restrain the Company's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company.  The circumstances under which the Board may respond to an unsolicited written bona fide proposal for an alternative acquisition that constitutes or would reasonably be expected to constitute a superior proposal are too narrowly circumscribed to provide an effective "fiduciary out" under the circumstances.  Likewise, these provisions also foreclose any likely alternate bidder from providing the needed market check of Exxon's inadequate offer price.

## DEFENDANTS' REGISTRATION STATEMENT AND AMENDED REGISTRATION STATEMENT

### The Materially Misleading and Incomplete Registration Statement

54.     Plaintiffs Amended Complaint, filed with this Court on February 5, 2010 (the "Amended Complaint") alleged that the Form S-4 Registration Statement (the "Registration Statement") filed by Exxon on February 1, 2010 failed to provide the Company's shareholders

17

with material information and/or provides them with materially misleading information thereby rendering the shareholders unable to make an informed decision on whether to vote in favor of the Proposed Transaction.

55.     Plaintiffs' Amended Complaint alleged that the Registration Statement completely failed to disclose the underlying methodologies, projections, key inputs and multiples relied upon and observed by Barclays Capital Inc. ("Barclays"), the Company's financial advisor, so that shareholders can properly assess the credibility of the various analyses performed by Barclays and relied upon by the Board in recommending the Proposed Transaction.  In particular, Plaintiffs' Amended Complaint alleged that the Registration Statement was deficient and should provide, *inter alia*, the following:

(i)      The financial projections of XTO relied upon by Barclays in rendering its fairness opinion, including a) the XTO research projections published by First Call, and b) the projections that Barclays prepared in consultation with management of XTO, as well as the assumptions underlying such projections.

(ii)     The financial projections of Exxon relied upon by Barclays in rendering its fairness opinion.

(iii)    The estimates of the proved reserves of oil and gas relied upon by Barclays in rendering its fairness opinion.

(iv)    The estimates of the non-proved oil and gas reserve potential relied upon by Barclays in rendering its fairness opinion, including the Low-Risk Upside Resource Potential and the Additional Resource Potential.

(v)     The reserve, production, and capital cost estimates used in the *Net Asset Valuation Analysis.*

(vi)    The discount rate range used and the criteria used to select such discount rate range used in the *Net Asset Valuation Analysis*.

(vii)   The adjustments Barclays made to the price forecasts in the *Net Asset Valuation Analysis.*

(viii)   The scenarios reflected by each of Cases I-III used in the *Net Asset Valuation Analysis*, which is particularly important considering XTO's implied value calculated for Case III is higher than the Proposed Transaction value.

(ix)   The methodology used by Barclays to arrive at the equity value per share range of XTO from the reserve projections in the *Net Asset Valuation Analysis.*

(x)   The "size and asset characteristics" of the companies used in the *Comparable Company Analysis* that Barclays deemed similar to XTO.

(xi)   The multiples observed for each company in the *Comparable Companies Analysis.*

(xii)   XTO's 2008 Pro Form Proved Reserves, Latest Daily Production, and discretionary cash flow for years 2010 and 2011 used in the *Comparable Companies Analysis.*

(xiii)   The implied per share equity value range of XTO for each of the four multiples that were analyzed in the *Comparable Companies Analysis.*

(xiv)   The "size and asset characteristics" of the target companies used in the *Comparable Transactions Analysis* that Barclays deemed similar to XTO.

(xv)   The transaction value and multiples observed for each transaction in the *Comparable Transactions Analysis.*

(xvi)   The specific "qualitative judgments" made by Barclays to select the reference ranges it used in the *Comparable Transactions Analysis* to calculate an implied value range for XTO.

(xvii)   The implied per share equity value range of XTO for each of the two multiples that reference ranges were selected from in the *Comparable Transactions Analysis.*

(xviii)   The specific criteria used to select the terminal multiples used in the *Discounted Cash Flow Analysis*, i.e. which comparable companies and transactions were used to calculate such multiples, and the criteria used to select them.

(xix)   The "historical and future estimates of the weighted average cost of capital for XTO" observed in the *Discounted Cash Flow*

*Analysis,* and the comparable companies used in their weighted average cost of capital ("WACC") calculation, as well as the WACC's observed for each of those compaies.

(xx)   The transactions and premiums observed for each transaction used in the *Premiums Analysis*.

(xxi)   Details and key inputs used in the accretion/dilution analysis performed by Barclays.

(xxii)   Whether Barclays performed any analyses to calculate the implied per share value of Exxon common stock, and if so, to provide such analyses; and if not, the reasons for not doing so.

56.   Plaintiffs' Amended Complaint also alleged that the Registration Statement stated that "Barclays Capital was not provided with, and did not have any access to, financial projections of XTO Energy prepared by the management of XTO Energy," but failed to disclose the reasons Barclays was not provided with or have access to such projections.

57.   Plaintiffs' Amended Complaint alleged that the Registration Statement failed to disclose whether Jefferies & Company, Incorporated ("Jefferies"), one of the Company's financial advisors, performed any financial analysis with respect to the Proposed Transaction, and if so, to disclose such analyses. Additionally, Plaintiffs alleged that the Registration Statement should disclose the specific role and services Jefferies performed as the second financial advisor in the Proposed Transaction, considering it is receiving a $24 million transaction fee, and in light of the fact that director Randall is a senior member of Jefferies.

58.   Plaintiffs Amended Complaint alleged that the Registration Statement failed to describe material information concerning the reasons the Company failed to conduct a market check to solicit potential acquirers other than Exxon. In particular, Plaintiffs alleged that the Registration Statement:

(i)   Stated that on October 21, 2009, the Board discussed "the prospects of a third party other than ExxonMobil being able to

engage in an alternative strategic transaction," but failed to disclose what was determined as a result of such discussion, including the reasons the Board determined not to contact such parties.

(ii) Stated that on November 9, 2009, Barclays discussed with the Board "the potential third parties that might be capable of a transaction with XTO….and the prospects of a third party making a proposal for an alternative strategic transaction that could be competitive with the proposed merger" but failed to disclose how many parties were discussed, the prospects of those third parties making a competitive proposal, and the reasons the Board did not contact such parties.

(iii) Stated that on November 17, 2009, the Board discussed "potential parties that might be capable of a transaction with XTO Energy of the type being proposed by ExxonMobil," but again failed to disclose how many parties were discussed and the reasons the Board did not contact such parties.

(iv) Failed to disclose the reasons Defendant Randall first "raised the possibility of a strategic combination involving" XTO and Exxon in a meeting with Exxon on August 6, 2009.

59. Finally, Plaintiffs' Amended Complaint alleged that the Registration Statement neglected to provide shareholders with sufficient information to evaluate the pros and cons associated with strategic alternatives other than the sale of the Company -- information which is vital to shareholders in deciding how to vote regarding the Proposed Transaction. For example, Plaintiffs alleged that the Registration Statement stated that on November 9, 2009, the Board discussed a "range of potential strategic alternatives and options for XTO Energy that the XTO Energy board of directors might consider, including XTO Energy continuing to operate as an independent company, certain recapitalization transactions and other types of strategic transactions," but failed to disclose what was determined with respect to continuing to operate as an independent company, as well as what recapitalization transactions and other transactions were discussed and the reasons such alternatives were not pursued.

21

60.     Based on these material misrepresentations and omission in the Registration Statement, Plaintiffs sought injunctive and other equitable relief to prevent irreparable injury to Company shareholders.

**Defendants Amend the Registration Statement to Correct Disclosure Deficiencies**

61.     On March 24, 2010, Exxon filed Amendment No. 1 to Form S-4 Registration Statement (the "Amended Registration Statement") with the SEC.  Exxon filed this Amended Registration Statement while Plaintiffs' Amended Complaint was pending, prior to this Court's April 8, 2010 dismissal without prejudice of the Amended Complaint.  The Amended Registration Statement disclosed the specific information Plaintiffs claimed in their Amended Complaint had been omitted from the original Registration Statement.

62.     The Amended Registration Statement filed by Exxon has disclosed the following information regarding the underlying methodologies, projections, key inputs and multiples relied upon and observed by Barclay, the absence of which formed the basis for Plaintiffs' material misrepresentation and omission claims in the Amended Complaint:

> (i)     A summary of the projected financial data for XTO prepared by Barclay's for the purposes of performing its analysis and rendering its opinion.  The summary includes projected financial data as of December 2009 for the fiscal years ending 2010 through 2014 and provides projected financial data for the following categories: (1) Production (Mmcfe/d); (2) Benchmark prices for gas and oil; (3) EBITDA; and (4) Capital Expenditures divided into drilling, midstream and other discretionary expenditures.

22

(ii) Selected estimated quantities of proved reserves of XTO as of December 31, 2009, 2008, and 2007.  The table includes estimates for developed, undeveloped and total gas, natural gas and oil.

(iii) The discount rate range of between 6% and 18% and criteria used to select such discount rate range used  in the *Net Valuation Analysis;*

(iv) The basis for adjustments Barclays made to the price forecasts in the *Net Asset Valuation Analysis*;

(v) The methodology used by Barclays to arrive at the equity value per share range of XTO in the *Net Asset Valuation Analysis*;

(vi) The "size and asset characteristics" of the companies used in the *Comparative Company Analysis*;

(vii) The pro forma proved reserve multiple range from $2.34 to $2.79, the latest daily production multiple range from $8,664 to $11,343 and the discretionary cash flow multiple range from 3.7x to 6.1x in 2010 and 3.4x to 6.0x in 2011 as used in the *Comparable Companies Analysis*;

(viii) XTO's 2008 Pro Form Proved Reserves, Latest Daily Production and discretionary cash flow for years 2010 and 2011 used in the *Comparable Companies Analysis*;

(ix) The implied per share equity value range of $35.65 to $49.80 of XTO implied in the *Comparable Companies Analysis*;

23

(x) The "size and asset characteristics" of the target companies used in the *Comparable Transactions Analysis*; and

(xi) The comparable companies and transactions that were used in the *Discounted Cash Flow Analysis*.

63. The Amended Registration Statement filed by Exxon discloses the reasons why Barclays was not provided with projections of XTO prepared by XTO. The Amended Registration Statements states that "XTO Energy does not, as a matter of course, prepare or make public projected financial data for extended periods." It further states that Barclays prepared financial projections for XTO "due to the limited scope of, and time periods covered by, the consensus estimates published by First Call of independent equity research analysts with respect to XTO Energy and the limited time periods covered by the information prepared by XTO Energy as part of its regular internal business planning process."

64. The Amended Registration Statement filed by Exxon discloses the role and services Jeffries performed with respect to the Proposed Transaction. It states that "provided financial advisory services to XTO Energy regarding the proposed merger, including support for negotiations as well as advice regarding market and industry conditions."

65. The Amended Registration Statement filed by Exxon discloses the strategic alternatives and options reviewed by Barclays that were discussed by the Board at their November 9, 2009 meeting, including "a leveraged recapitalization and a sponsor-assisted recapitalization, a leveraged buyout and dividing XTO Energy's oil and gas businesses."

66. The Amended Registration Statement filed by Exxon discloses that at the Board's November 17, 2009 meeting the Board concluded that it was unlikely that a third party could do a strategic alternative transaction with XTO "given the size of XTO Energy and the number of

24

parties with the ability to and interest in (based on the strategic focus of such parties) proposing such an alternative transaction."   The Amended Registration Statement also notes that "other potential strategic alternatives, including a transaction with a financial buyer, would require significant debt financing, the arrangement of which would add uncertainty of closing and would likely not be practical given the current economic and credit market conditions."

67.     Further, the material misrepresentations and omissions that Plaintiffs alleged in their Amended Complaint also formed the basis for their Motion for Preliminary Injunction, filed with this Court on March 2, 2010.  Thus, Defendants' amendments to the Registration Statement have substantially corrected Plaintiffs' allegations regarding the material misrepresentations and omissions therein and have obviated some of the harm that Plaintiffs sought to enjoin.  The addition of this information in the Amended Registration Statement will enable shareholders to make a more informed vote on the Proposed Transaction.

### Ongoing Material Omissions in the Amended Registration Statement

68.     However, even the amended Registration Statement still fails to disclose several material facts necessary to fully inform the shareholders concerning the Proposed Transaction so as to allow an informed vote.  These ongoing material omissions include:

(i)     The specific "qualitative judgments" made by Barclays to select the reference ranges it used in the *Comparable Transactions Analysis* to calculate an implied value range for XTO.

(ii)    The implied per share equity value range of XTO for each of the two multiples that reference ranges were selected from in the *Comparable Transactions Analysis.*

(iii)   The specific criteria used to select the terminal multiples used in the *Discounted Cash Flow Analysis*, i.e. which comparable companies and transactions were used to calculate such multiples, and the criteria used to select them.

(iv)    The "historical and future estimates of the weighted average cost of capital for XTO" observed in the *Discounted Cash Flow Analysis,* and the comparable companies used in their weighted average cost of capital ("WACC") calculation, as well as the WACC's observed for each of those compaies.

(v)     The transactions and premiums observed for each transaction used in the *Premiums Analysis*.

(vi)    Details and key inputs used in the accretion/dilution analysis performed by Barclays.

(vii)   Whether Barclays performed any analyses to calculate the implied per share value of Exxon common stock, and if so, to provide such analyses; and if not, the reasons for not doing so.

(viii)  What was determined at or following the November 9, 2009 Board meeting regarding XTO continuing to operate as an independent company, as well as what recapitalization transactions and other transactions were discussed and the reasons such alternatives were not pursued.

69.    Accordingly, Plaintiffs seek injunctive and other equitable relief to prevent the irreparable injury that Company shareholders will continue to suffer absent judicial intervention.

## CLAIMS FOR RELIEF

### COUNT I
### Breach of Fiduciary Duty
### (Against All Individual Defendants)

70.    Plaintiffs repeat all previous allegations as if set forth in full herein.

71.    As Directors of XTO, the Individual Defendants stand in a fiduciary relationship to Plaintiffs and the other public stockholders of the Company and owe them the highest fiduciary obligations of loyalty and care.

72.    As discussed herein, the Individual Defendants have breached their fiduciary duties to XTO shareholders by failing to engage in an honest and fair sale process.

26

73.     As a result of the Individual Defendants' breaches of their fiduciary duties, Plaintiffs and the Class will suffer irreparable injury in that they have not and will not receive their fair portion of the value of XTO's assets.

74.     Unless enjoined by this Court, the Individual Defendants will continue to breach their fiduciary duties owed to Plaintiffs and the Class, and may consummate the Proposed Transaction, to the irreparable harm of the Class.

75.     Plaintiffs and the Class have no adequate remedy at law.

## COUNT II
### Aiding and Abetting
### (Against XTO and Exxon)

76.     Plaintiffs repeat all previous allegations as if set forth in full herein.

77.     As alleged in more detail above, XTO and Exxon are well aware that the Individual Defendants have breached their fiduciary duties.  Defendants XTO and Exxon aided and abetted the Individual Defendants' breaches of fiduciary duties.

78.     As a result, Plaintiffs and the Class members are being harmed.

79.     Plaintiffs and the Class have no adequate remedy at law.

## COUNT III
### Equitable Assessment of Attorneys Fees and Expenses
### (Against All Defendants)

80.     Plaintiffs repeat all previous allegations as if set forth in full herein.

81.     On December 28, 2009, Plaintiff James R. Harrison filed his initial complaint alleging breaches of fiduciary duty by Defendants arising out of the Proposed Transaction.

82.     Plaintiff's suit was meritorious when filed.

83. On February 5, 2010, Plaintiffs filed an Amended Complaint alleging that the Registration Statement contained material misrepresentations and omissions, as detailed above in ¶¶ 55 – 59.

84. Plaintiffs sought injunctive and other equitable relief to prevent irreparable injury to Company shareholders.

85. Further, the material misrepresentations and omissions that Plaintiffs alleged in their Amended Complaint also formed the basis for their Motion for Preliminary Injunction, filed with this Court on March 2, 2010.

86. Recognizing the validity of Plaintiffs' allegations regarding these material misrepresentations and omissions, on March 24, 2010, Exxon filed the Amended Registration Statement with the SEC. The Amended Registration Statement disclosed much of the specific information Plaintiffs had alleged had been omitted from the previous Registration Statement. Exxon filed this Amended Registration Statement while Plaintiffs' Amended Complaint was pending, prior to this Court's April 8, 2010 dismissal of the Amended Complaint for failure to adequately plead subject matter jurisdiction.

87. Thus, Defendants' amendments to the Registration Statement have also obviated some of the harm that Plaintiffs sought to enjoin through their Motion for Preliminary Injunction, filed before Defendants' amendments.

88. The addition of this information in the Amended Registration Statement will enable shareholders to make a more informed vote on the Proposed Transaction. Thus, Plaintiffs conferred a benefit on XTO shareholders by alleging that specific material information had been omitted from Defendants' Registration Statement, thereby causing Defendants, in response to these allegations, to disclose this specific information.

89.     To date, Plaintiffs' counsel have not received any fees for the benefit that they provided to XTO and its shareholders, nor has counsel been reimbursed for their out-of-pocket expenses related to securing that benefit.  Accordingly, Plaintiffs' counsel is entitled to a fee in an amount to be determined by the Court or the trier of fact in addition to reimbursement of their actual out-of-pocket costs.  The Defendants should pay Plaintiffs' counsels' fees and reimburse their out-of-pocket expenses because it was the duty of Defendants to make full and adequate disclosures regarding the Proposed Transaction to XTO shareholders.

**WHEREFORE**, Plaintiffs demand judgment against Defendants jointly and severally, as follows:

(A)     declaring this action to be a class action and certifying Plaintiffs as Class representatives and their counsel as Class counsel;

(B)     enjoining, preliminarily and permanently, the Proposed Transaction;

(C)     in the event that the transaction is consummated prior to the entry of this Court's final judgment, rescinding it or awarding Plaintiffs and the Class rescissory damages;

(D)     directing that Defendants account to Plaintiffs and the other members of the Class for all damages caused by them and account for all profits and any special benefits obtained as a result of their breaches of their fiduciary duties;

(E)     awarding Plaintiffs the costs of this action, including a reasonable allowance for the fees and expenses of Plaintiffs' attorneys and experts; and

(F)     granting Plaintiffs and the other members of the Class such further relief as the Court deems just and proper.

Dated: April 15, 2010

Respectfully submitted,

/s/ Willie Briscoe
Willie Briscoe
State Bar No. 24001788

**THE BRISCOE LAW FIRM, PLLC**
8117 Preston Road, Suite 300
Dallas, Texas 75225
Telephone: 214.706.9314
Facsimile: 214.706.9315

*Counsel for Plaintiffs James R. Harrison and Walt Schumann*

*Of Counsel*:

**FINKELSTEIN THOMPSON LLP**
Donald J. Enright
Elizabeth K. Tripodi
1050 30th Street, NW
Washington, D.C. 20007
Telephone: (202) 337-8000
Facsimile: (202) 337-8090

**LEVI & KORSINSKY, LLP**
Joseph Levi
Juan E. Monteverde
Michael H. Rosner
30 Broad Street, 15th Floor
New York, NY 10004
Telephone: (212) 363-7500
Facsimile: (212) 363-7171

\

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system per the Local Rules.  Any other counsel of record will be served by facsimile transmission and/or hand delivery this 15th day of April, 2010.

/s/ Willie Briscoe

Willie Briscoe